Dear Rex W. Cowdry, M.D.
The Maryland Health Care Commission ("Commission" or "MHCC") is funded by fees assessed against various health care entities and practitioners. On behalf of the Commission and at the behest of the Legislative Auditor, you have asked for our opinion concerning the allocation of those fees for Fiscal Year 2002. During its 2001 session, the General Assembly delegated to the Commission the authority to revise the allocation of those fees in its regulations according to certain criteria. You ask whether the Commission should have implemented the new allocation method for Fiscal Year 2002 or properly relied on prior law in making the assessments for that year. If the Commission should have implemented the new law, a related question is whether the Commission must take some corrective action now with respect to the 2002 fees.
In our opinion, the Commission should have implemented the 2001 law, which was effective during the entire 2002 Fiscal Year, including the period during which the assessments were due, by amending its regulations appropriately. However, there is no action for the Commission to take at this date. The new allocation scheme was to be established through the amendment of the Commission's regulations, which the Commission ultimately accomplished for subsequent fiscal years. Those regulations had not been amended by the time the fees were due for the 2002 Fiscal Year and the Commission in fact applied the allocation formula set forth in the existing regulations. *Page 21 
 I Background
A. MHCC Functions
The Commission is an independent entity within the Department of Health and Mental Hygiene. See Annotated Code of Maryland, Health-General Article ("HG"), § 19-101 et seq. The Commission performs a variety of functions related to health care services in the State. Among other things, it is to develop strategies to contain health care costs and to expand access to health care services. HG § 19-103. It is to maintain a medical data base on health care services and report on trends. Id. It is charged with formulating a uniform set of benefits for the State's comprehensive standard health benefit plan for the small group market. HG § 19-108; Annotated Code of Maryland, Insurance Article, § 15-1207. The Commission also administers the certificate of need program under the State Health Plan for Facilities and Services. HG § 19-120 et seq.
B. Fee Assessments for MHCC Fund
To fund the Commission's activities, the Legislature created a special fund called the Maryland Health Care Commission Fund ("MHCC Fund"). HG § 19-111. The MHCC Fund derives its revenues from fees assessed on health insurers and nonprofit health service plans (collectively referred to as "payors"), hospitals, nursing homes, and health care practitioners. HG § 19-111(b). These fees are generally referred to as "user fees." The Legislature has set a ceiling on the total amount of the user fees that the Commission may assess in a fiscal year and has directed the Commission to assess the fees against each of four categories of users based on the portion of the Commission's workload attributable to each category. HG § 19-111(c)-(d). The Commission's regulations allocate a percentage of the total assessed fees per fiscal year to each category of users. COMAR 10.25.02, 10.25.03.
The General Assembly has amended the statute governing user fee assessments several times since the MHCC Fund was first created in 1999. Your inquiry concerns the proper allocation of user fees for Fiscal Year 2002. *Page 22 
 II History of User Fee Allocation
A. Evolution of Law Governing User Fees
In order to answer your question, we must first provide a snapshot of the law governing the allocation of fees during the first few years after the creation of the Commission. The Commission was created in 1999 as the result of the merger of two predecessor entities — the Health Resources Planning Commission ("HRPC") and the Health Care Access and Cost Commission ("HCACC"). Chapter 702, Laws of Maryland 1999. Both of the predecessor entities were funded by user fees.
1. User Fee Allocation upon Creation of Commission in 1999
Prior to the merger, the HRPC was supported by user fees assessed against hospitals and nursing homes; the cumulative total of such fees was capped by statute at $3,250,000. HG § 19-122 (1996 Repl. Vol. 1998 Supp.). The HCACC was supported by user fees assessed against health care practitioners[1] and payors; those fees were subject to a cumulative statutory cap of $5 million. HG § 19-1515 (1996 Repl. Vol. 1998 Supp.). The HCACC was authorized to waive fees for certain health care practitioners. HG § 19-1515(a)(2)(ii) (1996 Repl. Vol. 1998 Supp.).
The 1999 law that created the Commission largely combined the amount and allocation of fees associated with the two predecessor entities.[2] Under the new law, the Commission was authorized to charge user fees of up to $8,250,000 — the sum of the budget caps of the two predecessor commissions. HG § 19-111(c) (1996 Repl. Vol. 1999 Supp.). The new law allocated the fees among the four user groups as follows: hospitals — 36%, nursing homes — 5%, payors — 40%, health care practitioners — 19%. HG § 19-111(d) (1996 repl. Vol. 1999 Supp.). The Commission *Page 23 
incorporated that allocation in its regulations. See
27:16 Md. Reg. 1524-25 (August 11, 2000), adopting amendments proposed in
27:11 Md. Reg. 1097-99 (June 2, 2000).
The 1999 law also included a process for the assessment of user fees as to each group. Assessments for the next fiscal year were to be sent to payors, hospitals, and nursing homes by June 30 of each year.[3] HG § 19-111(h)(1)(ii), (h)(2)(iii), (h)(3)(iii). Such fees were to be paid by September 1 — in other words, each entity assessed would have at least 60 days to make payment. HG § 19-111(i). Fees assessed on health care practitioners were to be included in the licensing fees of those practitioners and transferred by the licensing boards to the Commission on a quarterly basis. HG § 19-111(e)(1). The new law continued to allow the Commission to waive fees for certain health care practitioners through regulation. HG § 19-111(e)(2).
In the 1999 law, the General Assembly directed the Commission to conduct a study and to make recommendations as to (1) the appropriate funding level of the Commission and (2) user fee allocation. Chapter 702, § 12, Laws of Maryland 1999.
2. 2001 Commission Study Concerning User Fees
The Commission submitted its report shortly before the beginning of the 2001 legislative session. Maryland Health Care Commission,Report on Maryland Health Care Commission User Fee Assessment (January 1, 2001). For a variety of reasons, the Commission recommended that the funding cap be raised to $10,000,000. Id. at 3. It presented five options for allocating user fee assessments among the four groups, including the status quo. After discussing staff recommendations and public comments on those options, the Commission recommended the following allocation of user fee assessments: hospitals — 28.5%, nursing homes — 13%, payors — 37.5%, and health care practitioners — 21%.Id. at 3-6. The Commission also recommended that the allocation formulas be eliminated from the statute and, instead, be adopted solely in Commission regulations. Id. at 6. *Page 24 
 3. 2001 Amendment of User Fee Statute
During the 2001 session, a bill was introduced to increase the assessment cap to $10,000,000 in accordance with the Commission's recommendation.[4] House Bill 1032 (2001) (first reader). A number of groups subject to the user fee assessments opposed an increase in the assessment cap without further specification as to how the user fee assessments would be allocated or a more explicit rationale for excluding some categories of practitioners from the assessments.See, e.g., Testimony of Med-Chi concerning House Bill 1032 before House Committee on Environmental Matters (March 7, 2001); Position Paper of DHMH Boards and Commissions concerning House Bill 1032 (2001).
That bill was amended in the House to incorporate the Commission's recommendation concerning the percentage allocation of user fee assessments among the four groups. House Bill 1032 (2001) (third reader). When the bill came before the Senate Finance Committee, the Commission recommended, consistent with its report, that the specific allocation percentages be deleted from the statute with the understanding that the Commission would revise the allocation of assessments in its regulations. Testimony of Maryland Health Care Commission before Senate Finance Committee concerning House Bill 1032 (2001). The Senate eliminated the percentages and added a provision directing that the Commission, in determining assessments, employ a methodology that relates assessments to the portion of the Commission's workload attributable to each category of users — a determination that would be recalculated every four years. The Commission indicated that the latter provision was "sufficiently specific to guide the adoption of regulations by the Commission and creates an objective basis by which the distribution would be calculated." Id. The House concurred in the Senate amendments. See House Bill 1032 (2001) (enrolled bill).
The amendments to House Bill 1032 also added standards for the Commission's waiver of user fees for certain health care practitioners. In particular, it directed the Commission to consider *Page 25 
the hourly wages of health care practitioners and give a preference for waivers to practitioners with hourly wages substantially below those of other practitioners.
The provisions concerning user fee cap and user fee assessments that appeared in the enrolled version of House Bill 1032 were also added to Senate Bill 786, another bill concerning the Commission that was before the Legislature in 2001, and its cross-filed version, House Bill 652. The Governor elected to sign Senate Bill 786, on May 15, 2001, which became Chapter 565, Laws of Maryland 2001, and vetoed the two House bills as duplicative. The bill became effective July 1, 2001.
B. Fee Allocation Applied by the Commission After Passage of 2001Amendment 1. Fee Allocation Applied for Fiscal Year 2002
You have advised us that the Commission sent out notices of fee assessments to users for Fiscal Year 2002 prior to July 1, 2001, with some sent as early as M ay 2001. Those assessments were based on the allocation formula that appeared in HG § 19-111(d) prior to passage of the 2001 law. Thus, for Fiscal Year 2002 — which, of course, began on July 1, 2001 — the Commission assessed and collected fees based on the old statutory allocation that had been repealed as of that date. The statutory allocation was also reflected in the Commission's regulations at that time. COMAR 10.25.02.02C, 10.25.03.02C (2001). We understand that the
Commission believed that it was obligated to use the old allocation formula because the 2001 law had not become effective at the time notice of assessments had to be made under the statute — i.e., by June 30, 2001 — even though the new statute would be effective during the fiscal year that those fees were due and to be collected.
2. Fee Allocation Applied for Subsequent Years
A few months later, the Commission proposed amendments to its regulations incorporating the allocation percentages that had been recommended in its January 2001 Report. Those amendments were adopted without change. See 29:5 Md. Reg. 503 (March 8, 2002), adoptingamendments proposed in 28:26 Md. Reg. 2289-91 (December 28, 2001). The amendments were extremely brief. The existing regulation governing assessments of health care practitioners was amended to change the percentage number and to *Page 26 
include a brief w aiver provision.[5] C O M A R 10.25.02.02C-D, .03A-C (2002). The regulation concerning allocation of fees to payors, hospitals, and nursing homes was amended simply by substituting new percentages for the old ones and qualifying the regulation as to the fiscal years to which it applied. COMAR 10.25.03.02C (2002).
In accordance with the statutory directive to recalculate the percentages every four years, those regulations were amended to alter th e percentage allocation again in 2005. See 32:7 M d. Reg. 681 (April 1, 2005), adopting amendments proposed in 32:2 Md. Reg. 166-67 (January 21, 2005).
C. Legislative Audits
In a September 2002 audit, the Legislative Auditor concluded that the Commission's allocation of user fees for Fiscal Year 2002 was not in accordance with the statute and recommended that the Commission consult with the Office of the Attorney General to determine whether future assessments should be adjusted as a result. Office of Legislative Audits, Audit Report — Department of Health and Mental Hygiene —Maryland Health Regulatory Commissions (September 2002) ("2002 Audit Report") at pp. 3-4. The adjustment suggested by the Auditor would not increase or decrease the total assessments, but simply reallocate fees among the categories of users.
In a response to the audit finding, the Commission differed with the Auditor's interpretation of the statute. It argued that the 2001 law had an effective date of July 1, 2001, solely for the purpose of increasing the cap on the MHCC Fund. 2002 Audit Report, Appendix. The Commission also argued that the legislation had added four new boards of health care practitioners to the assessment pool, [6] as well as a new methodology for waivers, and that there was *Page 27 
insufficient time between enactment of the bill and the new fiscal year to determine the precise universe of practitioners subject to assessment under the new law. Id. Finally, the Commission argued that the portion of the statute that required that fee notices be sent perhaps as early as May 2001 would have been violated if the Commission had attempted to implement revised assessment allocations prior to the effective date of the law. Id.
The Legislative Auditor reiterated its finding and recommendation about the Fiscal Year 2002 assessments in subsequent audits. See AuditReport — Department of Health and Mental Hygiene — Maryland HealthRegulatory Commissions (March 2006) at pp. 6-7 Appendix; Audit Report— Department of Health and Mental Hygiene — Maryland Health RegulatoryCommissions (November 2008) at pp. 5-6 Appendix.
Last year you requested this opinion in response to the Auditor's concerns.
 III Analysis
As we understand it, the two questions at issue are: (1) whether user fees should have been allocated for Fiscal Year 2002 according to a new methodology or whether they were properly allocated under the distribution percentages that preceded the passage of the 2001 law and (2) if a new methodology should have been used, what action the Commission should now take.
A. How Fees Were to be Allocated for Fiscal Year 2002
The 2001 law that eliminated the allocation percentages from the statute and that directed the Commission to adopt a new allocation formula based on its workload attributed to each category of users had an effective date of July 1, 2001 — the first day of Fiscal *Page 28 
Year 2002.[7] That law did not delay implementation of the new methodology or new allocation percentages.[8] Nor is there any indication in the available legislative history that any lag in implementation was contemplated. Accordingly, any change in the allocation formula required by that law applied to Fiscal Year 2002 in its entirety.
Changing a fee prospectively with an effective date of the beginning of the next fiscal year is not unusual or unprecedented. See, e.g., Chapter 444, §§ 1-4, 37, Laws of Maryland 2005 (altering various fees and taxes with an effective date of July 1 of the ensuing fiscal year). Indeed, it is consistent with the longstanding convention that the effective date of a bill affecting fiscal matters should coincide with the beginning of the fiscal year that it first affects. See Department of Legislative Services, Legislative Drafting Manual (2009) at 104, 107.[9] *Page 29 
It is true that fee assessments for Fiscal Year 2002 were to be sent to users by some time in June 2001, prior to the effective date of the new law. However, the Commission itself had proposed in January 2001 the new fee allocations that it eventually adopted. If there had been any doubt as to whether the Legislature would accept the Commission's recommendation, it was eliminated by early April 2001 when the General Assembly passed three bills with identical provisions delegating the fee allocation to Commission regulation. Any further doubt was eliminated when the Governor signed the Senate bill on May 15, 2001. Moreover, there was no legal impediment for the Commission to assess prospectively the fee that would be in effect at the time the fee was due, even if that fee were different from the fee in effect on the date the assessment was sent.
It might be argued, as the Commission has suggested, that the Legislature did not intend for the Commission to implement a new fee allocation regime because the six weeks between the final enactment of the law and the new fiscal year was insufficient as a practical matter for the Commission to implement the new law. On the other hand, the agency had already done the analysis and completed a report recommending a new allocation. Emergency regulations could have been attempted.[10]
The adoption of the new allocation required only a minimal revision of the Commission's existing regulations — as is evident from the regulations that the Commission eventually proposed in late 2001 to adopt the new allocation. Those amendments simply substituted the new percentages recommended in its January 2001 report for the old statutory percentages and briefly reiterated the new statutory provisions on possible waivers for categories of practitioners (although it was necessary for the Commission to undertake additional work to implement the waiver provision).
In the end, there is no indication in the text or the history of the 2001 law that the Legislature intended anything other than that the *Page 30 
law should take effect on its effective date. In our view, the new allocation regime was intended to take effect in Fiscal Year 2002.
B. Whether MHCC Should Take Further Action with Respect to FiscalYear 2002
We turn to the second aspect of your inquiry — what, if any, action the Commission should now take with respect to the Fiscal Year 2002 allocations.
Under the 2001 law, it was contemplated that the allocation percentages — i.e., whatever allocation the Commission chose in light of workload considerations — were to be reflected in the Commission's regulations. An argument might be made that the Commission should have applied the allocation recommended in its January 2001 report, which was in fact the allocation that it belatedly adopted in its regulations. However, the Commission had not adopted that allocation by the time that the fees were due to be paid for Fiscal Year 2002 (September 1, 2001).
In the absence of amended regulations embodying a new allocation formula based on workload, what allocation should the Commission have applied? The amended statute itself did not mandate any particular allocation. The Fiscal Note for the 2001 law, as revised at the time the bill was passed, indicated only that "proportionate assessmentscould change" as a result of the bill. Revised Fiscal Note for Senate Bill 786 (April 2, 2001) (emphasis added). Thus, despite the recommendation in the Commission's January 2001 report, it was not pre-ordained whether or how the Commission would change the existing allocation percentages.
It is also notable that, although the 2001 law directed the Commission to relate the new allocation scheme to the workload generated by each category of users, it also directed that the allocation formula be recalculated only every four years. Thus, it contemplated that the fee allocation would remain stable for a period of time, even if in some years there was not a precise correlation between fees and the workload generated by a particular category of users. In the absence of amended regulations with a new allocation, the use of the formula in the existing regulations in effect during most of Fiscal Year 2002 was consistent with this aspect of the new user fee assessment regime.
Finally, we note that an attempt at this date to apply the regulations adopted in 2002 — now superseded by 2005 amendments-for *Page 31 
purposes of Fiscal Year 2002 would present complex issues of retroactivity, not to mention practical problems of application. Thus, in our view, there is no action for the Commission to take at this time with respect to user fees for Fiscal Year 2002.
 IV Conclusion
For the reasons set forth above, the Commission should have implemented the 2001 law, which was effective during the entire 2002 fiscal year including the period that the assessments were due, by amending its regulations applicable to Fiscal Year 2002. However, in our view, the Commission need not take any action at this date. The new allocation scheme was to be established through the amendment of the Commission's regulations, which the Commission ultimately accomplished for subsequent fiscal years. Those regulations had not been amended by the time the fees were due for the 2002 Fiscal Year and the Commission in fact applied the allocation formula set forth in the existing regulations.
 Douglas F. Gansler Attorney General
 Robert N. McDonald Chief Counsel Opinions and Advice
[1] Fees assessed against health care practitioners were collected by the respective licensing boards together with other licensing fees. HG § 19-1515(b) (1996 Repl. Vol. 1998 Supp.).
[2] It eliminated third party administrators from the category of "payors."
[3] The fees were to be apportioned among payors according to the amount of premiums collected by each payor in Maryland. HG § 19-111(h)(1). Fees were to be apportioned among hospitals and nursing homes according to a formula that took into account each facility's gross operating revenue and admissions. HG § 19-111(h)(2), (h)(3).
[4] A representative of the Commission advised a legislative committee that the Commission was within $50,000 of exceeding the current statutory cap even if it took on no new projects. Testimony of Barbara McLean before Senate Finance Committee concerning Senate Bill 786 (March 15, 2001).
[5] We understand that the Commission also undertook a survey of each of the licensing boards to compute annual average wages for the various categories of practitioners for purposes of applying the waiver provision.
[6] The 2001 legislation law did not modify the definition of "health care practitioner." Presumably, the difference between practitioners subject to assessment under the prior law and those under the new law was a change in Commission practice — or perhaps more precisely, the inherited practice of one of its predecessor entities — rather than in the statute.
[7] It is true that the initial version of one of the 2001 bills — House Bill 1032 — would have had an effective date of October 1, 2001although that version of the bill simply increased the cap on the MHCC Fund to $10 million and did not affect user fee allocation. However, when that bill was amended in the House to include a change in the allocation percentages, the effective date was changed to July 1, 2001. The effective dates of the other two bills that affected user fee allocation — House Bill 652 and Senate Bill 786 — were always July 1, 2001. And, of course, the one bill that the Governor signed in fact took effect on July 1, 2001.
[8] By contrast, the 1999 law that created the Commission included several effective dates keyed to different stages in the merger of the prior entities. See Chapter 702, § 14, Laws of Maryland 1999 (July 1, 1999, effective date for provision concerning appointments to new Commission); id., § 15 (October 1, 1999, effective date for provisions relating to the merger of the predecessor entities into the Commission);id., § 9 (June 1, 2000, effective date for provisions relating to the creation of the MHCC Fund and the assessment of fees for that fund).
[9] Under the State Constitution, the default effective date for non-emergency bills is June 1 after the session in which the bill is passed. Maryland Constitution, Article III, § 31; Article XVI, § 2. However, the Legislature is free to specify later dates of enactment. Typically, bills with a fiscal impact are drafted to become effective on the first day of the fiscal year — i.e., July 1. Other bills that revise the law have effective dates of October 1 to allow the public to become familiar with the new law and for law publishers to include the text in pocket parts and new editions of code books. See Department of Legislative Services, Legislative Drafting Manual (2009) at 103-10.
[10] Of course, emergency regulations are subject to the approval of the Joint Committee on Administrative, Executive, and Legislative Review ("AELR Committee"). Annotated Code of Maryland, State Government Article, § 10-111(b). *Page 32